IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. <u>6:20-cr-210</u> |
| | ) | |
| vs. | ) | |
| | ) | |
| VIKTORS SUHORUKOVS | ) | SENTENCING MEMORANDUM |

The United States, by the undersigned Assistant United States Attorney, files this sentencing memorandum and responds to Defendant's objections to the Presentence Investigation Report ("PSR"). The United States requests the Court sentence Defendant within the advisory Guideline range of 63 to 78 months.

## RESPONSE TO OBJECTIONS

1. <u>Defendant was arrested on February 9, 2020</u>.

Defendant's first objection to the PSR is to his arrest date noted in paragraph 10 of the PSR. The Government agrees Defendant was arrested on February 9, 2020. The Government understands the PSR will be amended accordingly.

2. <u>A certain victim believed he received the same renewal invoice twice</u>.

Defendant's second objection to the PSR involves the statement in paragraph 24 that Defendant sent invoices twice to the same victim identified in paragraph 24. The Defendant objects to this paragraph and argues he never sent renewal invoices twice. The Government relied on the information as reported by this victim. While it is certainly possible the second invoice came from a similar firm offering trademark renewal services, the witness believed both invoices were from one of Defendant's entities.

3. <u>Certain victims believed the invoices were from the United States Patent and Trademark Office and not a third-party renewal company</u>.

Defendant's third and fourth objections to the PSR involve the statements in paragraphs 26, 29 and 32 that certain victims believed the invoices from Defendant's companies were actually from the United States Patent and Trademark Office ("USPTO"). Defendant argues the renewal letters "clearly state that the sender is a private service company" and there was "no similarity" between Defendant's renewal letters and the actual USPTO renewal letters. Paragraphs 26, 29, and 32 of the PSR only address certain victims' beliefs about the source of the invoices received from Defendant's companies. Defendant's objections to these paragraphs should be denied. The issue of the proposed enhancement for Defendant's misrepresentation as a government entity is discussed in paragraph 6 below.

4. <u>The Government is not aware of whether Defendant sent patent renewals</u>.

Defendant's fifth objection to the PSR involves the statements in paragraphs 33 and 38 that Defendant sent letters to individuals and business who owned patents <u>and</u> trademarks for renewal. This case only involves trademark renewals and the PSR should be amended accordingly.

5. <u>The parties stipulated the intended loss amount in this case is within the range of $1,500,000 and $3,500,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(J)</u>.

Defendant's sixth objection involves the intended loss amount. After the preparation of the initial PSR, the parties reached an agreement that the intended loss amount for the purpose of calculating Defendant's applicable sentencing guideline range is between $1,500,000 and $3,500,000 which corresponds to an increase of 16 levels instead of 18 levels. The Government recognizes the Court has not accepted the parties' agreement regarding the intended loss amount.

6. <u>The Defendant misrepresented that he was acting on behalf of a government agency</u>.

Defendant's seventh objection involves the proposed enhancement for misrepresenting that he was acting on behalf of a government agency under U.S.S.G. § 2B1.1(b)(9)(A). This enhancement is appropriately applied in this case.

The Guidelines provide a two-level enhancement when the "offense involved [ ] a misrepresentation that the defendant was acting on behalf of . . . a government agency." U.S.S.G. § 2B1.1(b)(9)(A). The enhancement applies "in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of . . . a government agency (regardless of whether the defendant actually was associated with the . . . government agency) when, in fact, the defendant intended to divert all or part of that benefit (*e.g.* for the defendant's personal gain)." U.S.S.G. § 2B1.1, cmt. N.8(B).

This enhancement is applicable based on the implicit representations contained in the renewal notices which strongly suggested the notices came from the United States Patent and Trademark Office ("USPTO"). For this enhancement to apply, Defendant's misrepresentation that he was acting on behalf of a government agency does *not* have to be direct. *See United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017). In other words, a defendant does not have to expressly state he is acting on behalf of a government agency. In *White*, the Fourth Circuit Court of Appeals upheld the district court's application of this enhancement based on the defendant's fraudulent tax statements which induced the victim to remit money. *Id*. at 675. The tax statement did not contain any direct misrepresentation that the defendant acted on behalf of the IRS. *Id*. Instead, the defendant "solicited tax payments through the fraudulent IRS notices and thereby misrepresented a government agency." *Id*. at 675.

A crucial aspect of Defendant's scheme was the overall appearance and information contained in the renewal notices, which created the appearance and belief the notices came from the USPTO.  First, Defendant carefully selected business names ("Patent and Trademark Office" and "Patent and Trademark Bureau") which closely resembled The United States Patent and Trademark Office.  Second, Defendant carefully selected cities with significant government and financial presences (Washington, D.C. and New York, New York) in which he registered these companies to do business.  These addresses are reflected on Defendant's renewal notices.  Third, the Defendant included a QR Code which linked the trademark holder directly to the official government USPTO website.  The notices, of course, misrepresented the renewal date for the trademarks and induced victims to remit money to Defendant when the trademark was not scheduled to expire at the time stated in the notice.  Similar to the victim in *United States v. White*, Defendant misrepresented the USPTO through the fraudulent renewal notices.

The Government acknowledges Defendant's renewal notices contained a statement that the entity is a private service company and a non-government company which is not connected to any of the "governmental organizations."  However, this important information is in fine print (smaller than the other typeface in the notice), buried in the notice, and not readily visible.  The Defendant's effort to hide, or at the least minimize, this information worked to conceal the true source of the renewal notices.  As noted in the PSR, many victims believed the notices came from the USPTO and not from a third-party company.  PSR, at ¶¶ 26, 29, and 32.

      7.     <u>A substantial part of Defendant's scheme was committed from outside the United States</u>.

Defendant's eighth objection involves the proposed enhancement for the commission of a substantial part of Defendant's scheme from outside the United States under U.S.S.G. § 2B1.1(b)(10)(B). This enhancement is appropriately applied in this case.

This enhancement applies if a "substantial part" of the fraudulent scheme was committed from outside the United States. U.S.S.G. § 2B1.1(b)(10)(B). There is no application note for this section of the Guidelines. In determining whether a substantial part of a fraud occurred outside the United States, courts review "the overall scheme itself, not just the individual conduct of the participants." *United States v. Williams*, 838 Fed. App'x 493 (11th Cir. 2020). "The scheme does not need to originate from outside the United States, and the defendant does not need to take action outside the United States for the enhancement to apply." *Id*.

In *United States v. Williams,* the Eleventh Circuit Court of Appeals upheld the district court's application of this sentencing enhancement. *Id*. In *Williams*, the defendant was convicted in the district court of mail fraud, wire fraud and conspiracy to commit these offenses. *Id*. at 494. Williams himself operated within the United States; however at least two unindicted co-conspirators operated in Jamaica. *Id.* at 495. These unindicted co-conspirators made calls to victims in the United States and "coordinated how and where the money should be sent, and coordinated the efforts of Williams and other co-conspirators." *Id.* The Court found the scheme was "orchestrated" in Jamaica and upheld the enhancement. *Id*.

In *United States v. Duperval,* the Eleventh Circuit Court of Appeals found this enhancement applied to defendant's money laundering conviction. 777 F.3d 1324 (11th Cir. 2015). Even though the money laundering occurred in the United States, the Court held a substantial part of underlying offense (wire fraud) occurred outside the United States. *Id.* at 1336.

5

The Court noted the defendant worked, lived, and met with co-conspirators in Haiti while conducting the wire fraud scheme. *Id.* It was irrelevant that defendant's money laundering activities occurred within the United States. *Id*.

Here, the Defendant orchestrated, managed, and conducted the mail fraud scheme from outside the United States. It is undisputed that Defendant resided in Latvia during the commission of the offense. During the scheme (March 2017 to February 2020), the Defendant made eight trips to the United States on the following dates[1]:

> April 23, 2017 to May 7, 2017;
>
> November 12, 2017 to November 17, 2017;
>
> December 1, 2018 to December 13, 2018;
>
> April 27, 2019 to May 2, 2019;
>
> August 3, 2019 to August 9, 2019;
>
> August 17, 2019 to August 22, 2019;
>
> September 2, 2019 to September 14, 2019; and
>
> October 15, 2019 to December 29, 2019.

In total, over the course of almost three years, the Defendant stayed in the United States a total of 142 days. Notably, of those 142 days, 76 occurred during one trip to the United States (from October 15, 2019 to December 29, 2019). While operating the scheme in 2018, Defendant made only one trip to the United States, in late 2018. Further, an associate of the Defendant in the United States sometimes collected checks for the renewal fees and mailed the checks to Latvia where Defendant endorsed the checks and returned them back to the United States for deposit. The Government acknowledges that some of the logistics to implement the scheme occurred in the

---

[1] This list does not include February 9, 2020, the date Defendant was arrested.

United States, including the registration of the business entities in the United States and the printing and mailing of the renewal notices in the United States. However, Defendant committed the overwhelming part of the scheme from outside the United States.

8.  <u>The Defendant's mail fraud scheme involved the use of sophisticated means</u>.

Defendant's ninth objection involves the proposed enhancement for the use of sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). This enhancement is appropriately applied in this case.

"'Sophisticated means' means especially complex or especially intricate offense conduct, pertaining to the execution or concealment of an offense . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (citing U.S.S.G. § 2B1.1 cmt. n. 9(B); *Stinson v. United States*, 508 U.S. 36, 38 (1993). The enhancement applies when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." *United States v. Borders*, 829 F.3d 558 (8th Cir. 2016). However, "[e]ven if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *Id*. "The sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place." *United States v. Meadows*, 866 F.3d 913, 918 (8th Cir. 2017) (citing *United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016)

To effectuate this scheme, Defendant created and operated two companies, Patent and Trademark Office, LLC, a limited liability company registered in the District of Columbia, and Patent and Trademark Bureau, LLC, a limited liability company registered in New York.

Defendant carefully selected the names of these entities which closely resembled the USPTO. Defendant carefully coordinated cities with significant government and financial presences in which to register the businesses to help conceal the true source of the renewal notices. The Defendant sent or caused to be sent renewal notices from these entities to individual and entities. While the information needed to send the notices to the trademark holders is publicly available from the USTPO's website, Defendant selected which trademarks renewal notices to send out.

The Defendant determined when to send the notices and directed a mass mailing service in the United States to send the notices. The notices, as previously discussed in this Memorandum, misrepresented the trademark's expiration and contained a QR Code which linked the trademark holder directly to the official government USPTO website. Defendant effectively concealed the true source of the notices which caused numerous victims to unknowingly send renewal fees to Defendant's entities believing they were dealing with the USPTO. PSR, at ¶ 26, 29, 32.

The sheer length of time the Defendant operated the scheme, the identity and number of victims, and the loss amounts also support the sophisticated means enhancement. Defendant carried out the mail fraud scheme for almost three years, from March 2017 to January 2020. The Government has identified over 2,900 actual victims of the Defendant's scheme. The victims range from individuals to large, sophisticated companies, to a government entity. One of the notices contained in Defendant's Exhibit 1 is "U.S. Customs and Border Protection Office of Border Patrol," a government agency. As previously noted, the parties stipulate the intended loss amount to be within the range of $1,500,000 and $3,500,000. Agents seized over $2.4 million from accounts in the name of Defendant's entities from various financial institutions.

9. <u>The date the Defendant moved out of his family home</u>.

Defendant's tenth objection to the PSR is to the date the Defendant moved out of his family home as noted in paragraph 63 of the PSR. The Government has no objection to amending the PSR to reflect the date proposed by the Defendant.

10. <u>Spelling corrections to paragraph 70</u>.

The Government has no objection to correcting the spelling of the words proposed by the Defendant in paragraph 70.

11. <u>Total offense level.</u>

If the Court accepts the parties' agreement concerning the loss amount ($1,500,000 to $3,500,000), the total offense level is 26 and the corresponding Guideline imprisonment range is 63 to 78 months.

12. <u>Other mitigating factors alleged by the Defendant.</u>

The Defendant argues his immigration status and confinement during COVID-19 are mitigating factors warranting a substantial downward departure/variance. The Government does not believe these mitigating factors warrant a downward departure/variance.

## CONCLUSION

For the foregoing reasons, the Government believes that the Probation Office's calculation under the advisory Guidelines is accurate and appropriate. If the Court accepts the parties' agreement concerning the loss amount ($1,500,000 to $3,500,000), the total offense level is 26 and the corresponding Guideline imprisonment range is 63 to 78 months.

Respectfully submitted,

M. RHETT DEHART
ACTING UNITED STATES ATTORNEY


By:  *s/ Winston I. Marosek*
     Winston I. Marosek (Fed I.D. 13189)
     Assistant United States Attorney
     55 Beattie Place, Suite 700
     Greenville, South Carolina 29601
     864-282-2100
     Winston.Marosek@usdoj.gov

June 29, 2021

10